**BELOIT BEVERAGE CO., Plaintiff,**

v.

**WINTERBROOK CORP, Defendants.**

No. 93–C–477.

United States District Court,
E.D. Wisconsin.

Sept. 22, 1995.

James R. Sommers, Hunter & Sommers, Waukesha, WI, for Plaintiff.

Richard J. Sankovitz, Whyte, Hirschboeck & Dudek, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter previously came before the Court on defendant's objections to the Recommendation of Magistrate Judge Aaron E. Goodstein granting plaintiff's motion for a preliminary injunction. At that time, the Court sustained defendant's objection, declined to follow the Magistrate's Recommendation and denied plaintiff's request for an injunction. The matter now comes before the Court on the parties' cross-motions for summary judgment. Both motions rely, in large part, on the same factual premises and legal arguments raised in their prior motions, although some additional facts and authorities are cited and argued to the Court. After considering the same, the Court does not think plaintiff's position has improved on summary judgment. For the following reasons, the Court grants defendant's motion for summary judgment and denies plaintiff's motion, thereby dismissing the case.

## FACTS

The following facts are undisputed. Some are drawn from the Court's prior opinion, some are drawn from the stipulated facts submitted by the parties, and some are drawn from additional affidavits and deposition testimony submitted on summary judgment:

Beloit Beverage Co. ("Beloit") is a wholesale beverage distributor with operations in southeastern Wisconsin. (Decision and Order Dated June 17, 1994 ("Dec'n") at 1.) It is a substantial enterprise. (Id. at 1–2.) Beloit had $43 million in sales in 1992, yielding $11.2 million in gross profits. (Stip'n at ¶¶ 7, 9.) It employs over 100 workers. (Dec'n at 2.) Beloit distributes 200 different brands of alcoholic and non-alcoholic beverages out of five warehouses located across southeastern Wisconsin and northern Illinois. (Id.) It is one of the largest beer distributors in Wisconsin. (Id.) It is the largest distributor of Coors beer in the state. (Id.) It is one of the largest distributors of Stroh's in the state. (Id.) It is also one of the largest distributors of Pabst beer in the country. (Id.)

Beloit has been a distributor for the G. Heileman Brewing Co. ("Heileman") since 1961. (Id.) Beloit is one of the top five distributors of Heileman products in the Midwest and perhaps in the country. (Id.) This dispute involves the distribution of "La Croix" mineral water, a former Heileman product. When Heileman introduced the La Croix brand in 1982, Heileman assigned various Wisconsin distributors as exclusive wholesale suppliers of the product for specific territories within Wisconsin. (Id.) Beloit was appointed the exclusive wholesale supplier of La Croix in Rock and Walworth counties. (Id.) The appointment was memorialized in a "Specialty Product Assignment" ("SPA") issued by Heileman. (Id.) A company by the name of Federl Distributing Company, Inc. ("Federl"), another beer and non-alcoholic beverage distributor, was appointed the exclusive wholesale supplier of

La Croix in Milwaukee and Waukesha counties.

In 1989, Federl received the benefit of a distribution change by Heileman. (Id.) The record shows that various chain food stores (specifically, Kohl's Food Stores, Sentry and Pick n' Save) are supplied by central chain warehouses (respectively, Kohl's, Godfrey Company and Roundy's). (Id. at 2–3.) These warehouses were located within Federl's territory, but the stores they supplied were located throughout Wisconsin. (Id. at 3.) Prior to 1989, sales of La Croix to these various chain stores were the exclusive right of the distributor assigned to the territory within which the stores themselves were located. (Id.) The decision whether to purchase La Croix was made by each store independently. (Id.) In 1989, Heileman changed this process by allowing Federl to sell directly to the warehouses, thereby selling La Croix to all of the stores belonging to the three chains, even though a large majority of those stores were located outside of Federl's territory. (Id.) Heileman also agreed to compensate the other distributors who, as a consequence, lost business from the chain stores located within their territories. (Id.) Prior to this change, Heileman presumably sold La Croix to only some of the chain stores, because each store made its own purchase decision and not every store purchased. (Id.) By selling to the three warehouses, Heileman in effect sold to *all* of the chain stores, because these stores must buy or stock whatever the warehouse buys. (Id.) The warehouses became Federl customers because they were located within Milwaukee and Waukesha counties. (Id.)

In April of 1990, Beloit purchased substantially all of the assets of Federl for approximately $5 million. (Id.; Stip'n at ¶ 21.) These assets included selected equipment and distributor agreements. (Stip'n at ¶ 21.) One of the distributor agreements Beloit purchased was Federl's SPA with Heileman for distributing the La Croix product in Milwaukee and Waukesha counties, which by definition included Federl's business with the chain store warehouses. (Id.) Heileman immediately consented to the purchase.[1] (Id.) Beloit recouped the "purchase price" of the Federl investment within two years by virtue of the additional cash flow created by the investment. (Morello 5/14/93 Dep. at 75–76.)

After purchasing Federl, 66% of Beloit's subsequent La Croix business consisted of sales to the chain store warehouses. (Dec'n at 4.) This accounts for the undisputed fact that Beloit's profit margins on the sale of La Croix are higher than on other products. (Id.) That is, making a large, one-time sale to a central warehouse imposes less costs on a distributor than an equally large combination of sales to stores spread throughout a territory. (Id.) The latter inherently entails higher solicitation and delivery costs in terms of the number of salesmen, trucks and fuel necessary to obtain and consummate the sales. (Id.) The parties continue to dispute, however, the extent of the difference in profit margins and the extent of La Croix's contribution to Beloit's bottom line.

No one disputes, however, the following facts and figures: In 1992, Beloit's total net sales were $43,001,115. (Stip'n at ¶ 7.) Its net sales of La Croix were $1,937,000, meaning La Croix accounted for 4.5% of Beloit's total net sales in 1992. (Id. at ¶¶ 8, 11.) That same year, Beloit's total gross profit was $11,276,109. (Id. at ¶ 9.) Its gross profit on sales of La Croix was $658,000, meaning that La Croix accounted for 5.8% of Beloit's gross profits in 1992. (Id. at ¶¶ 10–11.) In 1993, Beloit's total net sales were $40,423,486. (Id. at ¶ 7.) Its net sales of La Croix were $1,802,378, meaning that La Croix again accounted for 4.5% of Beloit's total net sales in 1993. (Id. at ¶¶ 8, 12.) That same year, Beloit's total gross profit was $10,230,596. (Id. at ¶ 9.) Its gross profit on sales of

---

**1.** Beloit maintains that Heileman representatives actually conceived the idea of the transaction, made the initial contact with Beloit, organized and attended numerous meetings between Beloit and Federl, told Beloit representatives they wanted Beloit to purchase Federl, monitored and commented upon the actual proposals exchanged between the parties, and provided financial incentives to both sides to complete the deal. (Morello Third Aff. at ¶ 9.) Whether or not these allegations are true is immaterial in light of the fact that Beloit now admits that it has already recouped its entire investment in the Federl business through the additional cash flow the investment created. (See discussion at Section III–B, *infra*.)

La Croix was $538,000, meaning that La Croix accounted for 5.3% of Beloit's gross profits in 1993. (Id. at ¶¶ 10, 12.) In terms of volume, La Croix accounted for 9.32% of Beloit's total sales in 1991, 8.25% in 1992, and 8.78% for the first 4½ months of 1993. (Beloit Brief in Support at 16.)

In 1992 and 1993, Beloit employed over 100 workers. (Stip'n at ¶ 15.) In 1992, 14 Beloit employees devoted an estimated 13,-208 hours of time to promoting, selling and distributing La Croix. (Id.) This time constitutes the full-time equivalent of between 6 and 7 employees, or 6–7% of Beloit's work force. (Id.) In 1992, Beloit expended $71,-498.00 in advertisements, promotion and special events relating to the La Croix line. (Id. at ¶ 26.) In 1991 and 1992, Beloit also expended roughly $18,000 in "slotting fees" to the chain store warehouses to reserve shelf space for the La Croix product. (Id. at ¶ 24; Dec'n at 16.) In 1993, Beloit displayed the La Croix logo on two of its 100 delivery trucks—and not the current trademark, but one that was four years out of date at the time. (Id. at ¶ 17.) The La Croix logo was not displayed on Beloit's letterhead nor on its warehouses. (Id.) The logo is displayed on some of Beloit's employee uniforms. (Id.)

Beloit leases one warehouse that is primarily used to store La Croix. (Id. at ¶ 18.) This warehouse is located on Teutonia Avenue in Milwaukee. (Id.) The lease on this warehouse runs from year to year, and is terminable every year upon 60 days notice. (Id.) Beloit uses approximately 40% of the space in this warehouse to store La Croix, and uses the remaining space to store loaded delivery trucks overnight, and for truck maintenance operations. (Id.) Beloit leases another warehouse from a partnership, in which Beloit is one of three equal partners. (Id. at ¶ 19.) This warehouse is located on Bradley Road in Milwaukee. (Id.) This warehouse contains 15,000 square feet of office space which is used as the headquarters for all of Beloit's operations. (Id.) The warehouse contains 25,000 square feet of truck storage space. (Id.) The warehouse contains 50,000 square feet of warehouse space, of which approximately 10,000 square feet is dedicated to the storage and handling

of La Croix. (Id.) The partnership that owns the warehouse is ready, willing and able to sell the warehouse if an offer of $3 million is made for its purchase. (Id.) None of the warehouse space which Beloit uses to store La Croix is use-specific to La Croix. (Id. at ¶ 20.) If La Croix is not stored there, another product can be. (Id.).

In December, 1992, the defendant, Winter-Brook Corporation ("WinterBrook"), purchased the La Croix brand from Heileman. (Dec'n at 5.) WinterBrook sells three lines of sparkling water (La Croix, WinterBrook and Cascadia) from its headquarters in Bellevue, Washington. (Id.) As part of Winter-Brook's purchase of La Croix, the SPA between Heileman and Beloit was fully assigned to WinterBrook and WinterBrook expressly assumed Heileman's obligations thereunder. (Id.; Stip'n at ¶ 4.) The agreement also provided that:

> Notwithstanding the terms of Section 11.17 of the Agreement or of the agreements referred to in this Exhibit A, (A) the franchise laws of certain states may restrict the ability of Seller to terminate agreements with distributors or other customers doing business in such states on thirty (30) days' written notice, and (b) the Wisconsin Fair Dealership Law, Chapter 135, Wisconsin Statutes, may impose similar restrictions.

(Stip'n at ¶ 5.)

Within a matter of months (specifically, on April 29, 1993), WinterBrook notified Beloit that, as of May 31, 1993, it was terminating their relationship in accordance with the thirty-day notice period provided in the SPA. (Dec'n at 5; Stip'n at ¶ 6.) Beloit brought this suit in Waukesha County Circuit Court for violation of the Wisconsin Fair Dealership Law ("WFDL"), seeking preliminary and permanent injunctive relief. (Dec'n at 5.) WinterBrook removed the matter to federal court.

## LEGAL ANALYSIS

### I. SUMMARY JUDGMENT STANDARDS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. at 2555. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* Rather, the standard for summary judgment is now the same as that for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Thus, "[a] party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge,....'" *Palucki,* 879 F.2d at 1572. Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

## II. THE WFDL

The central issue in this dispute is whether Beloit qualifies as a La Croix dealer-

ship. In order to be a "dealership" under the WFDL, three requirements must be met:

1. a contract or agreement between two or more persons;
2. by which a person is granted:
   a. the right to sell goods or services;
   b. the right to distribute goods or services; or
   c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; and
3. in which there is a *community of interest* in the business of:
   a. offering goods or services;
   b. selling goods or services; or
   c. distributing goods or services at wholesale, retail by lease, agreement or otherwise.

(Dec'n at 7.)

▆ There is no dispute that the first two elements of a dealership are satisfied. (Id.) The parties strongly contest, however, the existence of a "community of interest" between Beloit and WinterBrook. This is no surprise. "Community of interest is the criteria that most distinguishes dealerships from the other forms of business agreements." *C.L. Thompson Co. v. Festo Corp.*, 708 F.Supp. 221, 224 (E.D.Wis.1989). The WFDL defines "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). The Wisconsin Supreme Court has described this definition as "troublesome" insofar as it "has been difficult to delimit with any precision." *Ziegler Co. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873, 877 (1987). The 7th Circuit has been less subtle in its criticism. "We have in the past disparaged this definition as vague and unhelpful, . . . for it permits no ready way in which to differentiate a dealership from any ordinary vendor/vendee relationship." *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992) (citations omitted). Perhaps in response to such criticism, "[t]he Wisconsin Supreme Court recently illuminated matters somewhat by establishing two 'guideposts' that serve to distinguish communities of interest." *Id.* "The first guidepost is the dealer's and grantor's 'continuing financial interest' in their business relationship; a dealer can manifest such an interest by, among other things, investing in grantor-specific inventory and facilities." *Id.*, citing and quoting *Ziegler*, 407 N.W.2d at 880. "The second guidepost is 'interdependence', which the Court described as 'shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship.'" *Id.*, citing and quoting *Ziegler*, 407 N.W.2d at 879. To further define the issue, *Ziegler* also set out a list of ten factors which courts should consider in determining whether a dealership exists:

1. The length of the parties relationship.
2. The extent and nature of the obligations imposed by the parties' contract or agreement.
3. The percentage of time or revenue the grantee devotes to the grantor's products or services.
4. The percentage of the grantee's gross proceeds or profits that the grantee derives from the grantor's products or services.
5. The extent and nature of the grantor's grant of territory to the grantee.
6. The extent and nature of the grantee's uses of the grantor's commercial symbols.
7. The extent and nature of the grantee's financial investment in the inventory, facilities, or goodwill of the alleged dealership.
8. The personnel devoted to the alleged dealership by the grantee.
9. The extent of the grantee's expenditures on advertising or promotion for the grantor's products or services.
10. The extent and nature of any supplementary services provided by the grantee to consumers of the grantor's products and services.

*Kayser Ford, Inc. v. Northern Rebuilders, Inc.*, 760 F.Supp. 749, 752 (W.D.Wis.1991).

▆ The problem with a "totality of the circumstances" approach involving so many

factors is that it becomes easy to miss the main thrust of the statute. Perhaps for that reason, the 7th Circuit has "distilled the principles underlying the Wisconsin cases" so as to "provide that a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments ... specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination." *Frieburg*, 978 F.2d at 399. This approach focuses the Court's attention upon the principles underlying the WFDL. "The [WFDL] is primarily intended to protect businesses whose economic livelihood *would be imperiled* by the termination of the dealership and not businesses whose economic livelihood is not exclusively dependent on any one manufacturer." *C.L. Thompson*, 708 F.Supp. at 226, emphasis supplied; *see also, Kusel Equipment Co. v. Eclipse Packaging Equipment Ltd.*, 647 F.Supp. 80, 81–82 (E.D.Wis.1986) ("[t]he law was an attempt to equalize the economic positions of grantors and dealers and to protect dealers from the *devastation* which would result from being terminated by a grantor whose products were a significant part of the dealer's business"). The statute was intended to prevent "unscrupulous grantor[s]" from engaging in "opportunistic behavior" by "exploit[ing] the fear of termination that naturally attends a dealer's investment in grantor-specific assets." *Frieburg*, 978 F.2d at 399. Such a fear can be exploited only if termination has a "significant economic impact" upon, or poses "severe economic consequences" for, the alleged dealer. *Id.; see also, Ziegler*, 407 N.W.2d at 879. While courts are not to look for some "fixed percentage of ... business revenues" in order to determine whether a dealership exists, "[a] low percentage is strong evidence, evidence that might ultimately be determinative in many cases, that there is no continuing financial interest between the parties in the operation of the business and thus no community of interest." *Ziegler*, 407 N.W.2d at 878, 880. Thus, while the ten factors listed in *Ziegler* serve to "structure any inquiry into these matters", *Frieburg*, 978 F.2d at 399, they should not be

applied in a way that effectively redefines the scope and intent of the statute.

### III. APPLICATION

■ As indicated earlier, the facts and arguments presented on summary judgment remain largely unchanged from those presented to the Court on the prior motion for preliminary injunction. The additional facts or arguments raised relate primarily to the two factors emphasized by the 7th Circuit in *Frieburg, i.e.,* the proportion of Beloit's revenues derived from the sales of La Croix and the existence of sizable investments, specialized in some way to the sale of La Croix, and hence not recoverable by Beloit.

### A. Proportion of Revenues.

■ The nature of the parties' arguments on this issue have not changed, although some of the evidence marshalled in support thereof has. First, there is no dispute that, from a "gross profits" analysis (where the question is how much revenue a particular product generates for purposes of offsetting *all* of the expenses of running the business), La Croix accounted for only 5.8% of Beloit's gross profits in 1992 and only 5.3% of Beloit's gross profits in 1993. There is no argument, and under the circumstances could be none, that these numbers, taken alone, are indicative of a dealership. Indeed, for a business as large and diversified as Beloit's, such percentages are strong evidence that a dealership does not exist. *Ziegler*, 407 N.W.2d at 878, 880. Rather, Beloit argues that a "net operating income" or "incremental profits" analysis (where the question is how much revenue a particular product generates for purposes of offsetting *only those expenses directly related to the selling of that product*) is the more appropriate analysis for this case. The basic thrust of Beloit's argument is that, because of the low costs involved in selling large volumes of La Croix to the chain store warehouses, the profit margins for the La Croix product are much higher than Beloit's other products. Beloit argues that, while sales of La Croix represent only 5% of Beloit's gross profits, they represent in excess of 20% of Beloit's "net operating income", and thus are substantial enough to

qualify as a dealership. There are several reasons to reject Beloit's analysis.

First, most or all of the Wisconsin cases have analyzed this issue from a "gross profits" perspective. In *Ziegler,* for example, the Wisconsin Supreme Court phrased the issue as "what percentage of the *gross proceeds or profits* of the alleged dealer derives from the alleged grantor's products or services". *Ziegler,* 407 N.W.2d at 879. Moreover, the 7th Circuit has expressly rejected Beloit's "incremental" approach:

> He suggested instead that the loss of less than 6% of its sales would deprive Kenosha Liquor of some 35% of its profits. Barsby arrived at this conclusion by subtracting from Kenosha Liquor's sales of Jose Cuervo tequila in 1987 ($174,636) the price it paid Heublein ($144,728), and dividing the difference ($29,908), *less a few direct costs such as salesmen's commissions,* by Kenosha Liquor's stated net profits ($67,586). *The effect depends on assuming that the brand in question is not responsible for the rent, salaries, and other variable costs*—variable, at least, in the not-so-long run. Barsby did not suggest that the same method applied to any other 6% of Kenosha Liquor's sales would not produce the same appearance. Accounting profits in a closely held corporation such as Kenosha Liquor are not necessarily useful figures; the investors' returns will be paid out as salaries to reduce the corporate tax. At all events, any method that attributes 40% of the profits to 6% of the sales—any 6% and every 6%—is unhelpful in identifying a dealer.

*Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 420 (7th Cir.1990) (emphasis supplied).

Second, Beloit's own expert witness, in a case where he apparently testified on behalf of the party arguing *against* the existence of a dealership, maintained in strong terms that the "incremental" or "net operating income" approach is not appropriate for determining the percentage of business attributable to a particular product line for purposes of the WFDL:

3. I am aware of the *Ziegler* case and the factors set forth by the court for purposes of determining dealership status.

4. There is no ambiguity with the concept of "gross profits". It is my opinion to a reasonable degree of marketing and economic certainty that the phrase "gross profits" is a term of art with only one recognized meaning. "Gross profits" is calculated as follows:

Sales Revenues
*Cost of Goods Sold*
Gross Profits

The "gross profits" result is the amount of money available for contribution to the costs of operation of the business.

5. I have reviewed the affidavit of Robert E. DeYoung submitted on behalf of the plaintiff. I am familiar with the economic analysis employed by Mr. DeYoung. A net profit analysis is an appropriate mechanism in certain situations *for determining damages that a company has incurred.... However, a net profit analysis does not address the question of how much money can be contributed by a particular product line for purposes of offsetting the company's operating expenses. For that reason, the appropriate analysis is that used by the Ziegler Court when it indicated that gross profits are to be considered as one of ten factors to be used for considering the community of interest element in the dealership analysis.*

6. *If the task is to determine the percentage of Johnson Cheese's business that each of its product lines contributes, ... the gross profit analysis is the appropriate means.* Each of the product lines will have a gross profit dollar amount that, when totaled, will equal 100% of the company's gross profit dollars. Those gross profits can then be used to offset operating costs and yield a final net profit or loss, as the case may be. *If Mr. DeYoung's percentage of business analysis were used, the total of each product line's gross profits reduced only by variable costs directly attributed to sales of that product line would vastly exceed 100% of the company's net profits. For a percentage of business analysis, it is inappropriate to use a anal-*

*ysis that will yield a result where the total of the gross profits less variable costs for each product line calculated as a percentage of total net profits of the business far exceeds 100% of the total net profits for the business.* It is for that reason that the gross profit analysis is appropriate for the percentage of business component of the *Ziegler* analysis, even if Mr. DeYoung's analysis of reducing gross profits by variable expenses may be an appropriate damage calculation.

(Joint App., Tab 13 at ¶¶ 3–6; emphasis supplied.)

Third, although Beloit suggests that its 20% figure takes into account those general expenses unrelated to the specific task of selling La Croix, it fails to present sufficient evidence in this regard to raise a *genuine* dispute of fact. Beloit's evidentiary support for this position is the prior affidavit of its vice-president, Ralph Morello, submitted at the preliminary injunction stage. In that affidavit, Morello simply states that the "Direct Operating Expenses" line contained in the audit from which Beloit draws its figures includes these indirect costs. Morello does not provide, however, a specific breakdown, item-by-item, of how this figure was achieved. He does not tell us, for example, what indirect costs he refers to or what amounts were allocated to these costs. He does not tell us whether a portion of *all* of the indirect costs associated with running Beloit's business were factored into this calculation. He does not "do the math" and demonstrate to the Court that a proportional percentage of Beloit's indirect operating expenses were allocated to, and charged against, the income derived from the sales of La Croix before reaching the "net operating income" figures Beloit relies upon. Absent such evidence, the Court cannot give any significant weight to the self-serving statements contained in Morello's affidavit, especially where—as here—the Court warned Beloit that it needed to produce such evidence if it wished to prevail on this issue:

This Court disagrees. WinterBrook produced a document prepared and submitted by Beloit which itemized the expenses which were used to reach the $251,000 figure.

(WinterBrook Reply at Ex. 2.) As WinterBrook argues, the indirect expenses referenced above are not included within that document. (Id.; WinterBrook Reply at 2–5.) Beloit does not dispute that such costs should be taken into account as a charge against La Croix revenues on a percentage basis. Rather, Beloit simply asserts that they were taken into account, without any documentation or itemization other than the financial statement. Obviously, this is a dispute of material fact that is difficult to resolve, but resolving it is not our ultimate task. At this stage, we look to the likelihood of success on the issue and, on the record described here, WinterBrook has the advantage. The Court does not think there is a substantial basis in the record for a percentage close to 15% of all net profits. The record at this point supports a figure much lower and, in any event, a figure insufficient for purposes of the injunctive relief sought here.

(Dec'n at 14–15.)

## B. Sunk Investments.

As Beloit admits in its briefing, this case really turns upon the issue of "sunk investments", and this because of Beloit's purchase of Federl's assets. Beloit argues that "[w]hat makes this case unique and requires that Beloit receive the protection of the Wisconsin Fair Dealership Law is the investment Beloit made when it purchased the La Croix distribution rights as part of the assets it bought from Federl...." (Beloit Rebuttal at 1.) As stated earlier, Beloit spent almost $5 million of its own money to acquire Federl's assets. One of those assets was the SPA Federl had with Heileman to distribute La Croix in Waukesha and Milwaukee counties. The parties focus much of their dispute on how much of the purchase price, if any, should be allocated to this asset. However, the Court believes one must first answer whether Beloit's investment in this regard is truly "sunk".

As the Court indicated in its prior decision, treating Beloit's purchase of Federl's assets as a "sunk investment" giving rise to a dealership is problematic insofar as it could allow distributors to unilaterally create a dealership where none previously existed:

There is an even more fundamental problem with Beloit's position, however. The "sunk investments" issue deals with monies which an alleged dealer expended (1) in reliance upon his continued relationship with the grantor; (2) upon assets which are product-specific to grantor's goods; and (3) in a specific attempt to expand the market for the grantor's goods, either by investing in certain fixed assets to expand his own capacity to store and sell the goods (*i.e.,* warehouses, trucks, etc.) or by investing in certain intangible assets to increase product demand or refine his sales efforts (*i.e.,* advertising, training, etc.). For example, the purchase of warehouse facilities or delivery trucks used solely for the La Croix line expands the market for La Croix because it expands Beloit's capacity, *i.e.,* the new warehouses and trucks will store and deliver cases of La Croix that WinterBrook did not sell to Beloit, or anybody else, prior thereto. The purchase of Federl's assets was not this type of investment because it did not expand the market for La Croix; it simply transferred Federl's market to Beloit. It expanded Beloit's *share* of the market for La Croix, but it did not expand the market itself. The distinction is important because without it an arms-length transaction between two distributors, which had little to do with the alleged grantor, could give rise to a dealership in a situation where no dealership previously existed. For example, it appears clear that, without the issues raised by virtue of the Federl transaction, Beloit would not have an arguable claim for dealer status. Presumably neither would Federl, assuming the two businesses were similar in nature. Yet, accepting Beloit's argument, these two non-dealers could become one big dealer simply by a cash transaction requiring little more than the grantor's "ratification".

(Dec'n at 17–18.) In other words, prior to Beloit's purchase of Federl, Federl had an SPA with Heileman which presumably did not qualify as a La Croix dealership. That SPA was also terminable upon 30–days notice. When Beloit bought that SPA, it seems logical to conclude that Beloit simply stepped into Federl's shoes and therefore acquired no greater status or contractual rights, vis-a-vis Heileman, than Federl had prior to the purchase. Put another way, one can view that portion of the purchase price which is (at least theoretically) allocated to the purchase of Federl's SPA with Heileman as compensating or reimbursing Federl for the value of that asset, which value would typically include or reflect the time and money Federl expended in acquiring and developing that asset. If Federl's initial costs, in terms of the time and money expended in acquiring and developing that asset, did not create a dealership, how can a subsequent transfer of those costs from Federl to Beloit, through Beloit's payment of the purchase price, create a dealership. The transfer ought to simply put Beloit in the position that Federl was in prior to the sale, *i.e.,* a distributor without a dealership and terminable upon 30–days notice.

Beloit submits evidence, however, that the transfer was actually Heileman's idea, that it initiated and monitored the parties negotiations, and that it eventually induced and persuaded the parties to effect the transfer. Beloit also submits the case of *Bush v. National School Studios, Inc.,* 407 N.W.2d 883 (Wis.1987), where the Wisconsin Supreme Court treated monies the plaintiff expended in purchasing "territory rights" from another distributor as a "substantial financial investment" indicative of a dealership. Beloit relies upon the foregoing to argue that, on the facts presented here, it would be inequitable to allow Heileman to actively induce and encourage Beloit to purchase Federl's distribution rights at a substantial expense and then terminate Beloit (through Winter-Brook), causing it to lose the money it invested. But this argument reveals an even more fundamental problem with Beloit's position: Beloit has not, and will not, lose any of the money it invested in Federl. Beloit admits that it recouped the value of its investment in Federl within two years after the purchase by virtue of the additional cash flow the investment created. If Beloit loses its right to distribute La Croix today, it will not be in any worse position than it would have been in

had it never purchased Federl's assets in the first place.

The Court believes the foregoing admission is devastating to Beloit's case. As outlined earlier, the cases look for investments that are "grantor-specific" in the sense that they are "sunk" or "not fully recoverable upon termination."[2] *Frieburg,* 978 F.2d at 399. The emphasis is upon recoverability because the purpose of the WFDL, as discussed earlier, is to prevent "unscrupulous grantor[s]" from engaging in "opportunistic behavior" by "exploit[ing] the fear of termination that naturally attends a dealer's investment in grantor-specific assets." *Frieburg,* 978 F.2d at 399. That is, where a dealer has expended substantial funds that cannot be recovered upon termination, he is naturally more vulnerable to a grantor's unreasonable demands, because the failure to yield to those demands could result in termination and the loss of the funds at issue. Beloit itself concedes that "recoverability" is the key consideration:

> First, [WinterBrook] misses the point of what is required of an investment by a dealer for it to be proof of a "community of interest." What's required is that the investment be "not fully recoverable upon termination." *Frieburg,* supra, p. 399.... The cases recognize that a grantor has even more leverage over the dealer when the dealer has made a sizable nonrecoverable investment such that the grantor can exploit the dealer's fear of termination to wring out unfair concessions. The key requirement of the investment is that it be nonrecoverable on termination.

(Beloit Rebuttal at 2.) Thus, where a sizable investment is not fully recoverable, the WFDL tries to remedy the resulting disparities in bargaining position by removing the grantor's threat of arbitrary termination. Where, as here, the dealer has already recovered the value of the investment or funds at issue, there is no resulting disparity. There is no risk of losing the initial investment and therefore no fear to be exploited. The investment, regardless of its size, no longer

affects the parties' respective bargaining positions. In short, there is no imbalance for the WFDL to remedy, at least no imbalance created by the investment at issue. In such situations, any basis for invoking the protections of the WFDL must lie elsewhere.

## C. The Remaining *Ziegler* Factors.

Given the Court's earlier discussion on the "proportion of revenues" issue, and Beloit's own admission that it was the Federl investment which made its case unique and triggered the protections of the WFDL, it is unlikely that consideration of the remaining *Ziegler* factors will yield any basis for invoking the protections of the WFDL. The Court nonetheless considers those remaining factors. Much of the Court's discussion, however, simply repeats the discussion contained in the Court's prior decision denying Beloit's motion for a preliminary injunction.

### 1. The length of the parties' relationship.

WinterBrook had only been doing business with Beloit for a matter of months at the time of termination. The Court tacks on Beloit's relationship with Heileman, however, because WinterBrook expressly assumed Heileman's obligations under the SPA with Beloit. The result is that, at the time of termination, Beloit had sold La Croix for 13 years in Walworth and Rock counties, but only for 3 years in Ozaukee, Washington, Milwaukee and Waukesha counties (including the chain warehouses). The length of the relationship, at least with respect to Walworth and Rock counties, is significant.

### 2. Extent and nature of the parties' contractual obligations.

No one disputes that the SPA imposed substantial obligations upon Beloit to buy, sell and promote the La Croix line. These obligations are clearly listed by Beloit in its briefing herein. (See, Beloit Brief in Support at 15–16.) Merely listing the obligations imposed, however, does not tell us the extent

---

**2.** Even in *Bush,* the Wisconsin Supreme Court noted that the monies expended to purchase the "territory rights" at issue were "completely lost" at the time of termination. *Bush,* 407 N.W.2d at

893. There was no evidence, or perhaps no argument, that the dealer had recovered the value of his investment by the time he was terminated.

of the burden they placed upon Beloit. Such obligations become more or less significant depending upon the percentage of time a dealer devotes to satisfying them. As indicated in the next section, that percentage is not very high.

### 3. The percentage of time or revenue the grantee devotes to the grantor's products or services.

Beloit expends approximately 13,208 labor hours on the La Croix line, or the equivalent of 6–7 full-time employees. Beloit employs over 100 workers. Thus, only 6–7% of Beloit's time and efforts are directed to the La Croix line and the obligations imposed by the SPA. For a company as large and diversified as Beloit, this figure is not indicative of a dealership.

### 4. Percentage of gross proceeds or profits.

This factor is discussed and rejected in Section III–A, *supra.*

### 5. Extent and nature of grant of territory.

Beloit's territory is extensive, especially since it purchased Federl's assets in 1990. Within that territory, Beloit's rights are also exclusive. An extensive and exclusive territory certainly weighs in favor of a dealership, as does the 13–year relationship attributed to the parties. But these are the *only* factors that weigh in Beloit's favor, and they are not enough.

### 6. Use of trademarks and logos.

Beloit's use of the La Croix trademark and logo is relatively insignificant. Only 2 delivery trucks out of 100 bear the logo. A few of the employee uniforms bear the logo. The logo does not appear on Beloit's letterhead, nor on its warehouses. This is not indicative of a dealership.

### 7. Financial investment.

This factor has already been discussed and rejected with respect to the Federl investment. (See, Section III–B, *supra.*) However, Beloit continues to rely upon certain other "investments" which the Court previously stated were *not* sufficient to create a dealership: (1) Certain "slotting fees" paid to the warehouses to reserve shelf space in the chain stores for La Croix products; (2) the 20–25% of Beloit's warehouse space devoted to La Croix products; and (3) $86,000 in "start-up" costs for a non-alcohol division created to promote the La Croix brand. The Court remains convinced that these "investments" do not trigger the protections of the WFDL.

First, Beloit paid roughly $18,000 in certain "slotting fees" over a relevant two-year period.[3] These fees ensured that La Croix products received preferred shelf space in the chain stores. However, such fees are hardly a substantial investment for a $2 million dollar line of business. More importantly, it is difficult to characterize these fees as "sunk" insofar as Beloit acknowledges that some of the fees were recouped by the corresponding increase in sales. (Dec'n at 16.)

Second, La Croix products take up as much as 25% of Beloit's available warehouse space. As Beloit admits, however, there is nothing about this warehouse space that is use-specific to storing La Croix products. There is nothing in the record indicating that Beloit could not use this space to store other products. Moreover, the record indicates that the vast majority of the warehouse space at issue is leased, not owned, so the related expenses cannot be considered "sunk". They are better described as a simple cost of doing business. Such "investments" can be recouped (*i.e.,* such costs can be avoided) by terminating or assigning the leases.[4]

---

**3.** At the preliminary injunction stage, Beloit suggested that the shelving rights conferred by the slotting fees are now worth roughly $144,000 and that this figure reflects the amount of Beloit's investment. This Court disagrees. The inquiry here is the amount that Beloit is out-of-pocket, not the amount any one of its assets might have appreciated.

**4.** Beloit does own a one-third interest in one of the warehouses, but the Court's conclusion is not altered thereby. There is still nothing preventing the portion of that warehouse currently devoted

Third, Beloit claims it expended $86,000 in start-up costs establishing a non-alcohol division designed specifically to promote La Croix products. At the preliminary injunction stage, the Court noted that this figure of $86,000 was not itemized or documented in any way. (Dec'n at 19–20.) Beloit stated generally that it was comprised of "labor costs and associated overhead expense", but did not describe or explain what was specifically included therein. (Id.) It was also unclear how many other non-alcoholic products were included within the division and whether the $86,000 figure would have to be apportioned among them. In short, the Court concluded that "there is not enough specific evidence regarding this alleged investment to give it any considerable weight." (Id.) The record has not changed on summary judgment and neither has the Court's conclusion. To put it in language appropriate to summary judgment, Beloit fails to submit enough evidence on this issue to create a *genuine* dispute of material fact.

### 8. Personnel.

The record indicates that 14 Beloit workers devote some portion of their time to the La Croix line but that, as referenced earlier, the hours they devote are equivalent to only 6–7 full-time workers out of the 100–plus workers that Beloit employs. Again, 6–7% of the work force is not a substantial figure under the circumstances.

### 9. Promotional expenses.

Beloit spent $70,000 in advertising and promotional expenses for the La Croix line in 1992. This figure is relatively insignificant in the context of a $2 million line of business and a $43 million company. It is not indicative of a dealership.

### 10. Supplemental services.

Beloit submits some evidence that it cooperated with WinterBrook in the context of specific promotions of the La Croix product. The evidence submitted, however, does not

to La Croix products from being used to store other products. Moreover, the warehouse at issue is currently for sale, presumably at a profit,

strike the Court as sufficient to create a dealership.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Beloit's motion for summary judgment is denied; and

2. WinterBrook's motion for summary judgment is granted and the case dismissed.

**SO ORDERED.**

and hence the investment is certainly recoverable.