The **CABINETREE OF WISCONSIN, INC., Plaintiff,**

v.

**KRAFTMAID CABINETRY, INC., Defendant.**

**Civil Action No. 93–C–1217.**

United States District Court, E.D. Wisconsin.

Jan. 23, 1996.

Gordon F. Barrington, Wauwatosa, WI, for plaintiff.

Thomas R. Schrimpf, Hinshaw & Culbertson, Milwaukee, WI, for defendant.

## DECISION AND ORDER

REYNOLDS, District Judge.

### BACKGROUND

The Cabinetree of Wisconsin, Inc. ("Cabinetree"), sued KraftMaid Cabinetry, Inc. ("KraftMaid"), on or about September 30, 1993, alleging two separate causes of action. Cabinetree alleges that KraftMaid terminated their relationship in violation of the Wisconsin Fair Dealership Law ("WFDL"), § 135.01 *et seq.* Wis.Stat. Cabinetree also alleges that KraftMaid violated an oral agreement granting Cabinetree an exclusive territory. KraftMaid removed the case to federal court on November 4, 1993, then moved to stay the proceedings pending arbitration. On July 21, 1994, a hearing on the motion was held. The court denied the motion and the Seventh Circuit upheld it.

KraftMaid moved for summary judgment on August 4, 1995. Kraftmaid argues that Cabinetree is not a "dealership" under the WFDL and that any oral evidence that KraftMaid granted Cabinetree an exclusive territory contradicts the express language of the agreement and cannot be considered. Because there is no community of interests between the parties, and because oral evidence suggesting a grant of exclusivity to Cabinetree would contradict the express written language of the agreement, the court will grant KraftMaid's motion for summary judgment.[1]

### FACTS

The Cabinetree of Wisconsin, Inc. ("Cabinetree"), a Wisconsin corporation, sells and installs kitchen cabinets, bathroom cabinets, countertops, sinks, and faucets. KraftMaid is a foreign corporation, incorporated in the State of Ohio, whose principal place of busi-

---

1. Parties argue over whether KraftMaid terminated the relationship in violation of the WFDL. Because the relationship is not governed by the WFDL, the termination issue is moot.

ness is in Ohio. KraftMaid manufactures cabinets.

In 1989, Cary Sakol, a KraftMaid sales representative, approached Cabinetree about carrying the KraftMaid line. At that time only one retailer carried the KraftMaid line in the Milwaukee/Waukesha area. Cabinetree alleges that Sakol promised Cabinetree would be the exclusive dealer in that territory and that the promise induced Cabinetree to enter into a May 5, 1989, written contract with KraftMaid.

## The Sales Policy

The Sales Policy (entitled "Sales Policy")—drafted by KraftMaid—set out the following requirements:

> Customer shall display all product lines requested by KraftMaid at approved customer locations and actively promote the sale of KraftMaid products.

> Customer shall provide prompt, efficient, and satisfactory service for the company products and shall maintain adequate service and repair capability in order to represent all KraftMaid products. Customer shall prominently display and utilize Kraft-Maid's trademarks, trade names, and other brand indicia on his place(s) of business and other appropriate places. Customer shall make sure that all trademarks, trade names, patent notices, and other information specified by KraftMaid from time to time appear on or with the company products at the time they are resold.

> Customer shall comply with such terms of sale and any amendments made by KraftMaid from time to time. Certain information practices, pricing and procedures are confidential information, and are solely for KraftMaid customers. Kraft-Maid cannot offer exclusivity and therefore retains the right to market its products as deemed necessary.

(Plaintiff's Ex. F.) Cabinetree did not ask KraftMaid for any amendments to the policy and has no written correspondence with KraftMaid indicating that Cabinetree would be an exclusive dealer. (Ripple Dep., p. 51–52.) In addition, KraftMaid did not impose any minimum sales requirements. (Ripple Dep., p. 63.) Although a KraftMaid repre-

sentative did state that $100,000 in sales would establish the respectability of Cabinetree. (Ripple Dep., p. 61.)

## The Relationship

In 1989 at the beginning of the relationship, Cabinetree also carried the cabinet lines of six other manufacturers. After entering into the agreement with KraftMaid, Cabinetree stopped displaying one of its other cabinet lines but did not drop it. The decision was made at Cabinetree's discretion. (Ripple Dep., p. 56.)

Cabinetree hired three new sales people around the time the Sales Policy was signed in anticipation of increased sales volume but not specifically for the KraftMaid line. (Ripple Dep., p. 57.) No Cabinetree salesperson was a specialist for KraftMaid or any other cabinet line. Cabinetree salespeople were not required to direct customers to any particular line of cabinets. (Ripple Dep., p. 38.)

Cabinetree purchased four KraftMaid kitchen displays for $8,617 and spent $9,500 for expenses for design, supplies, and labor to set them up. Cabinetree sold three of the displays for a total of $9,400. (Ripple Dep., p. 70.) Cabinetree also spent $4,208 on sales aids and literature, and $1,249 on door samples which were displayed prominently in the store. (Ripple Dep., p. 59.) It also spent $4,170 a year on freight and booth rental to use KraftMaid displays at a trade show for the years 1990, 1991 and 1992. The booth rental was done at Cabinetree's discretion.

Cabinetree actively advertised KraftMaid and two other cabinet manufacturers. It had co-op advertising agreements with three of its cabinet suppliers, including KraftMaid. The co-op advertising agreement provided that KraftMaid would reimburse Cabinetree for 50% of all advertising exclusive to Kraft-Maid, up to a certain dollar amount. Cabinetree advertised above the dollar amount for which it would be reimbursed under the co-op agreement. Cabinetree advertised Kraft-Maid on its bulletin board and in prominent locations in the store. It also ran television advertisements including KraftMaid products that cost $3,000 a piece and advertised Kraft-Maid products on its billboard, in magazines, newspapers, and radio. Cabinetree did not

advertise KraftMaid products in its Yellow Pages advertisements but did advertise another cabinet line. All advertising was done at Cabinetree's discretion. (Ripple Dep., p. 76). KraftMaid did not have any input or impose any obligations except for the language in the policy that Cabinetree "actively promote" KraftMaid products.

At some point in time, KraftMaid offered a 50% discount to builders. Cabinetree received notice after KraftMaid had distributed the promotion notice to builders in the area. The parties dispute whether the program was mandatory for Cabinetree.

Cabinetree provided warranty service work on defective cabinets with a 1% of sales per month reimbursement by KraftMaid. One percent was not always enough to fully compensate Cabinetree for its costs. Cabinetree alleges that KraftMaid's field representative was inconsistent and this caused Cabinetree to do more service work.

**Sales**

Cabinetree was the only one selling Kraft-Maid products in the Milwaukee/Waukesha area from the inception of its relationship with KraftMaid in mid–1989 through sometime in 1992 when Menards and Handy Andy, two larger retailers, began carrying the KraftMaid line.

In 1990, Cabinetree sold $381,017 of Kraft-Maid products, constituting 25.08% of Cabinetree's gross sales ($1,519,202). In 1991, Cabinetree sold $317,787 of KraftMaid products, constituting 18.35% of Cabinetree's gross sales ($1,732,178), and in 1992 Cabinetree sold $243,945 of KraftMaid products, constituting 11.92% of sales ($2,045,918). (Ripple Aff., par. 26.) Cabinetree attributes the last drop in sales to the addition of the KraftMaid line by Menards and Handy Andy, two Milwaukee-area retailers, in the first quarter of 1992. KraftMaid argues that Cabinetree changed its focus to different cabinet lines.

In April of 1993, Cabinetree sent a kitchen order into KraftMaid and several days later received a facsimile from KraftMaid stating that Cabinetree had been placed on "inactive status". (Ripple Dep., p. 88.) According to KraftMaid, retailers who do not sell a certain amount of kitchen displays are made inactive, meaning KraftMaid would not extend credit. Cabinetree viewed this action as a termination of the relationship. In 1993, Cabinetree's total sales decreased approximately $408,000, which was a 20% decrease from 1992. (Ripple Aff., par. 26.)

Jurisdiction is proper pursuant to 28 U.S.C. § 1441. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. 1391(a).

### SUMMARY JUDGMENT STANDARD

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Even if some facts are in dispute, entry of summary judgment is in order if the movant either establishes uncontroverted facts entitling it to summary judgment or demonstrates that the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The court must draw all reasonable inferences from the record in favor of the nonmoving party. *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 150 (7th Cir.1994).

### ANALYSIS

The elements of a dealership under the Wisconsin Fair Dealership Law are: 1) an agreement between two or more persons, 2) by which one has granted certain rights to the other and 3) in which a community of interests exists in the business of offering, selling, or distributing goods or services at wholesale or retail. Wis.Stat. § 135.01 *et*

*seq.* The parties dispute whether a "community of interests" exists. A community of interests is "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). Determining whether a community of interests exists is fairly fact intensive inquiry. However, the court is guided by the overriding policy concern of the WFDL, which is prevent exploitation in those relationships where a grantor has the opportunity to exploit a dealer because the dealer has used substantial resources in developing the grantors products or services.

## I. Wisconsin Fair Dealership Law

■ The nature of the business arrangement between the parties did not provide an opportunity for KraftMaid to exploit Cabinetree. The purpose of the WFDL is to prevent exploitation, to prevent "suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand." *Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 419 (7th Cir.1990). Where there is "no opportunity to exploit", there is no community of interests. *Id.* Any examination of facts and factors must be viewed in light of this policy. It is clear from the record that KraftMaid was one of Cabinetree's main lines. Relative to other product lines, Cabinetree spent significant advertising dollars and received significant revenues from KraftMaid products. KraftMaid was prominently displayed inside the store, on bulletin boards, and at trade shows. Despite these facts, the evidence does not suggest an exploitative relationship.

■ Cabinetree did not have the type of financial interests in KraftMaid products to indicate a community of interests. A community of interests exists where the parties have both a continuing financial interest and manifest an "interdependence," through cooperation, coordination of activities and sharing of common goals, etc. *Ziegler Co., Inc. v. Rexnord, Inc.,* 139 Wis.2d 593, 604–605, 407 N.W.2d 873, 878–879 (1987). *Ziegler* articulated 10 factors to guide courts in determining community of interests. Parties in this case place great weight analyzing each factor articulated in *Ziegler;* factors, however, are not elements.[2] The court need not consider every factor in making a determination, nor is a consideration of every factor necessarily dispositive of the issue.[3] The Seventh Circuit distilled the 10 factors down to the following two circumstances where a community of interests may exist; where there are a "large proportion" of revenues derived from the dealership, or "sizable investments" in the dealership. *Frieburg Farm Equip., Inc.,* 978 F.2d 395, 399 (7th Cir.1992). Thus, the court will examine the revenues and investments of this relationship.

Cabinetree argues that it relied heavily on KraftMaid sales. While a large proportion of revenues is indicative of a dealership, it is not, necessarily, dispositive of the issue. *Sales & Marketing Assoc., Inc. v. Huffy Corp.,* 57 F.3d 602, 606 (7th Cir.1995).[4] In 1991, the last year Cabinetree had the territory to itself, it received 18% of its revenue from KraftMaid products. The alleged dealer in *Sales & Marketing* derived 23% of its

---

**2.** To maintain a valid cause of action, each element must be proved, whereas factors are only guidelines to assist the court in making a legal determination.

**3.** The following are the *Ziegler* factors: 1) length of the parties' relationship; 2) the extent and nature of the obligations imposed on the parties; 3) the percentage of time or revenue the alleged dealer devotes to the products or services; 4) the percentage of the gross proceeds or profits derived from the alleged grantor's product or services; 5) the extent and nature of the alleged grantor's grant of territory to the alleged dealer; 6) the extent and nature of the alleged dealer's uses of the alleged grantor's trademarks and logos; 7) the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; 8) the personnel which the alleged dealer devotes to the alleged dealership; 9) how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; 10) the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services. *Ziegler,* 139 Wis.2d at 604–08, 407 N.W.2d 873.

**4.** Lost future profits are not dispositive of the issue either. *Sales & Marketing,* 57 F.3d at 607.

revenues from the grantor's products, but the court concluded the WFDL did not apply because the alleged dealer could not establish any tangible loss other than lost profits. Thus, Cabinetree's potential loss of future profits is not sufficient to find a community of interests. The court must determine whether the character of Cabinetree's investments in the KraftMaid line provided KraftMaid the opportunity to exploit the relationship.

A dealership relationship may exist is where "the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination." *Frieburg*, 978 F.2d at 399. Cabinetree did not have such investments. It claims the following investments that total about $36,000: $8,617 to initially purchase four KraftMaid displays, $9,500 for design, supplies, and labor to set up the displays, $4,208 on sales aids and literature, $1,249 on door samples, and $4,170 a year on booths at home improvement shows for 1990, 1991 and 1992. Cabinetree also spent $3,000 per spot for television advertising, had KraftMaid products on its billboard, and invested in a co-op advertising program whereby KraftMaid would contribute 50% of the advertising cost up to a certain dollar amount.[5]

The investments in both television advertisements and booths at home improvement shows represents discretionary investments and therefore did not provide the type of opportunity for exploitation contemplated under the WFDL. Cabinetree argues that the agreement imposed advertising obligations on them. It's true that the language of the Sales Plan required Cabinetree to "actively promote" KraftMaid products, but KraftMaid had no control over and no participation in the advertising process. KraftMaid did not require television advertisements, booth rentals, or billboard advertising. All of those investments were discretionary. In contrast,

the plaintiffs' investments in *Frieburg* and *Ziegler* were alleged to be necessary for the continuation of the dealership relationship in question and thus nondiscretionary. The plaintiff in *Ziegler* spent almost $1,500,000 to purchase and construct new buildings, allegedly to insure adequate facilities for marketing the grantor's products. *Ziegler* 139 Wis.2d at 608, 407 N.W.2d 873. Similarly, in *Frieburg*, the plaintiff expended about $70,000 in grantor-specific investments. This included $30,000 to purchase property at a new location. The grantor in this case threatened to appoint another dealer if the plaintiff moved to a different location. *Frieburg*, 978 F.2d at 397. In both cases, the character of the investments provided an opportunity for the grantor to exploit the dealer. That is not the case here. Cabinetree places great weight on the requirements KraftMaid imposes through the Sales Policy. However, Cabinetree only refers to the language of the agreement and fails to address the reality that KraftMaid exercised minimal control. KraftMaid—but for the co-op plan—had no involvement in the promotional process.

Additionally, Cabinetree did not make sizable, *nonrecoverable* investments. Cabinetree purchased four KraftMaid displays during the course of the relationship, but a substantial portion of that investment was recovered. Three of the displays were sold for $9,400. These investments were unlike those in *Frieburg* and *Ziegler* where plaintiffs invested in fixed assets.

Finally, to the extent Cabinetree's investments were nonrecoverable, they were not sizable. As stated, plaintiff alleges about $36,000 of investments and at least $9,400 was recovered. Thus, about $26,600 is at issue.[6] During the period in question, the plaintiff's gross yearly sales were never less than $1,385,715. Thus, at most, plaintiff's potentially nonrecoverable investments ($26,000) represent less than 2% of any yearly sales figure. Furthermore, the total sales for the years 1989–1992 were $6,683,012[7];

---

5. The record does not reflect advertising costs for the co-op plan or how many television advertisements were run.

6. Co-op and television advertising are not included because the record does not contain those amounts.

7. Gross sales were as follows: 1989 sales were $1,385,715; 1990 sales were $1,519,202; 1991

$26,600 represents less than one half (1/2)% of that figure. Those percentages do not represent sizable investments. Again, the dollar amount is not, by itself, dispositive of the issue. The more telling inquiry is into the character of the investments and the impact of the investments on the business.

Cabinetree also argues that it spent a substantial amount of time on KraftMaid products including kitchen design work, warranty and service work, training of personnel, displays, advertising, and setting up booths at a home improvement shows. However, with the exception of the booths, most of these services were done at Cabinetree's discretion and were not distinct from the typical vendor-vendee relationship or the relationship Cabinetree had with its other suppliers. The court must be able to distinguish a dealership form a vendor-vendee relationship. *Ziegler* 139 Wis.2d at 608, 407 N.W.2d 873. Cabinetree points out that it hired new personnel in anticipation of increased sales volume but they were not hired expressly for the Kraft-Maid line. Salespeople were trained to sell all cabinet lines; no salespeople specialized in any cabinet line.

The KraftMaid line may have been unique within Cabinetree because it required the greatest amount of service work and because KraftMaid was the only cabinet line displayed at the home improvement shows, but not so unique as to imply a dealership under the WFDL.

## II. Parol Evidence Rule

■ Evidence of an oral agreement granting Cabinetree an exclusive territory contradicts the express language of the agreement. "When parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake." *In re Spring Valley Meats, Inc.*, 94 Wis.2d 600, 607, 288 N.W.2d 852, 855 (1980) (*quoting Federal Deposit Ins. Corp. v. First Mortgage Investors*, 76 Wis.2d 151, 156, 250 N.W.2d 362 (1977). Evidence of oral agreements is admissible to clarify an existing ambiguity as long as the evidence does not establish an understanding in variance with the terms of the written document. *Clark Oil Refining Corp. v. Leistikow*, 69 Wis.2d 226, 237–238, 230 N.W.2d 736 (1975). The agreement between KraftMaid and Cabinetree expressly provides: "KraftMaid cannot offer exclusivity and therefore retains the right to market its products as deemed necessary." Plaintiff argues that this clause is ambiguous because it does not mention the words territory, dealer, or customer in connection with exclusivity and because the phrase "right to market" is ambiguous. Although plaintiff has made assertions of ambiguity, simply stating it does not make it so. However, assuming *arguendo* that the phrase "right to market" is ambiguous, plaintiff fails to show the court how the interpretation it proposes—an oral grant of exclusivity—can co-exist with the express language of the agreement. Plaintiff fails to show the court how an oral grant of an exclusive territory or dealership does not in directly contradict the phrase "KraftMaid cannot offer exclusivity." Thus, despite any ambiguity over the phrase "the right to market", if "KraftMaid cannot offer exclusivity" means anything, it must mean that Kraft-Maid cannot offer exclusivity. For this reason, the court finds that any evidence suggesting a grant of exclusivity is inadmissible, and therefore, KraftMaid did not violate the agreement when it did business with Handy Andy and Menards.

For the above reasons, the court **GRANTS** KraftMaid's motion for summary judgment and the case is dismissed.

**SO ORDERED.**

sales were $1,732,178.56; and 1992 sales were $2,045,918.74.