**BALDEWEIN COMPANY, Plaintiff,**

v.

**TRI–CLOVER INC., Defendant.**

No. 97–CIV–213.

United States District Court,
E.D. Wisconsin.

Jan. 24, 2002.

Stuart Parsons, Daniel M. Janssen, Quarles & Brady, Milwaukee, WI, Michael Spurlock, Eric W. Beery, Beery & Spurlock Co., Columbus, OH, for plaintiff.

Joshua L. Gimbel, Charles P. Graupner, Michael Best & Friedrich, Milwaukee, WI, for defendant.

**DECISION AND ORDER**

RANDA, District Judge.

The Baldewein Company ("Baldewein"), an Illinois corporation with its principal

place of business in Franklin Park, Illinois, has sued Tri–Clover, Inc. ("Tri–Clover"), a Delaware corporation with its principal place of business in Kenosha, Wisconsin, under the Wisconsin Fair Dealership Law ("WFDL"). Baldewein contracted to distribute Tri–Clover's line of sanitary food process equipment, including fittings, valves, pumps, and tubing. The relationship endured for 56 years until, in June of 1996, Tri–Clover terminated the distributorship, and Baldewein sued. Tri–Clover counterclaimed for the value of unpaid-for shipments.

On March 9, 1998, the Court granted summary judgment in Tri–Clover's favor. The Court held that due to Baldewein's minimal level of sales in Wisconsin, its dealership was not "situated in" Wisconsin as required to hold Tri–Clover, the grantor of the dealership, liable under the WFDL. On appeal, the Seventh Circuit certified the matter to the Wisconsin Supreme Court which resulted in that Court answering the question, "when is a dealership 'situated in this state' under Wis.Stat. § 135.02(2), thereby entitling the dealer to protection under the [WFDL]?" *Baldewein Company v. Tri–Clover, Inc.*, 233 Wis.2d 57, 61, 606 N.W.2d 145, 146 (2000). In its answer the Wisconsin Supreme Court set forth a multi-factor test to be applied in determining when a dealership is "situated in" Wisconsin for purposes of the WFDL. Because this Court relied only on one factor in reaching its decision, the Seventh Circuit then reversed and remanded the case for further development of the evidence and application of the new multi-factor test established by the Wisconsin Supreme Court. *Baldewein Company v. Tri–Clover, Inc.*, 2000 WL 817674, 221 F.3d 1338 (2000) (unpublished disposition).

After further development of the facts and new arguments on the multi-factor test, cross-motions for summary judgment are once again before the Court. For the reasons stated below, the defendant's motion for summary judgment is granted, the plaintiff's motion for summary judgment is denied, and the case is dismissed.

## BACKGROUND

Baldewein was a distributor for Tri–Clover for 56 years. Baldewein's Proposed Findings of Fact ("PFOF"), ¶ 3; Tri–Clover's Response to PFOF ("DR"), ¶ 3. Baldewein's territory included the entire United States as well as some foreign countries. PFOF, ¶ 3. Over the years, Baldewein had come to rely upon its dealership with Tri–Clover. During the fiscal year which ended October 31, 1995, in excess of 81% of Baldewein's total sales, including installation and fabrication, were derived from the sale of Tri–Clover products. PFOF, ¶ 4; DR ¶ 4. Sale of the products alone represented 67.5% of Baldewein's total sales.[1] *Id.* Until the relationship was terminated, approximately 90% of Baldewein's efforts were devoted to promoting Tri–Clover products. PFOF, ¶ 18.

The parties agree that the vast majority of Baldewein's sales were always to Illinois customers. Tri–Clover's Proposed Findings of Fact ("DFOF"), ¶ 8; PFOF, ¶ 16. The percentage of Baldewein's sales to Wisconsin customers in the years leading up to termination were as follows: 0.5% for fiscal year 1992, 2.8% for 1993, 2.4% for 1994, 7% or 7.3% for 1995[2], and 7.2% for 1996. Court's March 9, 1998 Decision and

---

**1.** In the prior fiscal year, the numbers were 72% and 58.4%, respectively.

**2.** For this year, there is a difference in percentages because Tri–Clover assesses the amount of Wisconsin sales at $100,226.00, while Baldewein puts it at $105,651.04.

Order ("Decision and Order"), pp. 2–3; DFOF, ¶1; Baldewein's Response to DFOF ("PR"), ¶1. Neither party has produced Wisconsin sales figures for the prior fifty-one years of the relationship. However, Baldewein maintains, and Tri–Clover does not dispute, that there has always been *some* level of Wisconsin sales. PFOF, ¶17; DR, ¶17. Nonetheless, the Court is inclined to presume, as it did previously, that this level of sales was only *de minimis.*[3] Decision and Order, fn. 3.

In the early to mid–1990's, Baldewein hired two employees who lived in and worked out of Wisconsin. These "Wisconsin Employees" were hired to promote and increase sales in Wisconsin. PFOF, ¶38. The first employee, Jeff Stevens ("Stevens"), worked for Baldewein from 1991 to 1994.[4] DFOF, ¶26. Stevens kept inventory at his Wisconsin home. DFOF, ¶22; PR, ¶22. The other employee, Jeff Spore ("Spore"), worked for Baldewein in 1995 and 1996, after Stevens left. *Id.;* DFOF, ¶27. Spore also kept inventory at his Wisconsin residence. PFOF, ¶36 A. Valentin ("Val") Baldewein, owner and officer of Baldewein, maintained inventory at a lake cottage in Wisconsin during the 1980's. PFOF, ¶36 A. Val has since sold the home and no longer maintains inventory in the state. DFOF, ¶21.

## SUMMARY JUDGMENT STANDARDS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. 2548. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmov-

---

**3.** Baldewein claims that its pre–1992 sales ranged from .5% to 5%, but there is no documentary evidence in the record to support this conclusion. To defeat summary judg-

ment, it is, of course, Baldewein's burden to produce such evidence.

**4.** Stevens also worked for Baldewein in June of 1996, after termination.

ing party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## WFDL

It is useful, even though the case is here for a second time, to outline the WFDL's terminology as it applies to the parties in this case. The "dealer" is Baldewein. The "grantor" is Tri–Clover. Tri–Clover granted Baldewein a "dealership." The WFDL provides that the grantor of a dealership may not "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor." Wis.Stat. § 135.03. The WFDL also provides that its provisions "shall be liberally construed and applied to promote its underlying remedial purposes and policies." Wis.Stat. § 135.025(1). These purposes and policies include promoting fair business relations between dealers and grantors and protecting dealers against unfair treatment from grantors. Wis.Stat. § 135.025(2)(a–b). The WFDL was enacted to protect dealers, on the assumption that grantors "inherently have superior economic power and superior bargaining power in the negotiation of dealerships." Wis.Stat. § 135.025(2)(b).

In order to be considered a "dealer" under the WFDL, Baldewein must qualify as a "person who is a grantee of a *dealership situated in this state.*" Wis.Stat. § 135.02(2) (emphasis added). The statute as originally enacted did not include the

phrase "situated in this state." Accordingly, dealers "could invoke [the WFDL] against a Wisconsin manufacturer whose dealership contracts provided for the application of Wisconsin law to the relationships." Bowen and Butler, *The Wisconsin Fair Dealership Law*, § 1.7. In response, the legislature amended the statute in 1977, adding the phrase "situated in this state" "to limit the statute's application to Wisconsin dealers." *Id.* Baldewein is the grantee of Tri–Clover's dealership, but the question remains whether its dealership is "situated in" Wisconsin. The phrase has caused considerable confusion, mainly among federal courts sitting in diversity.[5]

## ANALYSIS

As noted above, the Court previously held that Baldewein's dealership was not "situated in" Wisconsin because of its low percentage of sales in this state. While the level of sales may be the single most influential factor in deciding whether a dealership is situated in the state,[6] on remand, the Court is required to consider all nine factors enumerated by the Wisconsin Supreme Court. The remaining eight factors are:

> [H]ow long the parties have dealt with each other in Wisconsin, the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin, the extent and nature of the grant of territory in Wisconsin, the extent and nature of the use of the grantor's pro-

---

**5.** See *CSS–Wisconsin Office v. Houston Satellite Sys. Inc.*, 779 F.Supp. 979 (E.D.Wis.1991) (dealership "situated in this state" so long as dealership conducts *some* business in Wisconsin); *Diesel Serv. Co. v. AMBAC Int'l Corp.*, 961 F.2d 635 (7th Cir.1992) (dealership which made 34% of its sales in Wisconsin "situated in this state"); *Lewis Communications v. Athletic Bus. Publications*, No. 97–C–132–S at 15 (W.D.Wis. Oct 7, 1997) (dealer must establish more than a de minimis connection with Wis-

consin to be considered "situated in this state").

**6.** The Wisconsin Supreme Court stated in its opinion that "Wisconsin sales percentages are highly significant. . . . In many cases, the dealer's level of sales in Wisconsin may be the single most influential factor in determining whether the dealership is situated here." *Baldewein*, 233 Wis.2d at 74, 606 N.W.2d 145.

prietary marks in this state, the extent and nature of the dealer's financial investment in inventory, facilities, and good will of the dealership in Wisconsin, the personnel devoted to the Wisconsin market, the level of advertising and/or promotional expenditures in Wisconsin, and the extent and nature of any supplementary services provided in Wisconsin. *Baldewein,* 233 Wis.2d at 75, 606 N.W.2d 145. The Supreme Court did not intend this list to be all-inclusive. "The inquiry should focus on the nature and extent of the dealership's development of, investment in and reliance upon the Wisconsin market." *Id.*

The WFDL further defines a dealership as "a contract or agreement ... by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a *community of interest* in the business of offering, selling or distributing goods or services." Wis.Stat. § 135.02(3) (emphasis added). "Community of interest" is defined as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). Although the meaning of the phrase "community of interest" is not an issue before the Court today, the Wisconsin Supreme Court, in delineating the test outlined

above, adapted its "community of interest" test to the "situated in this state" requirement. "The multiple factor 'community of interest' test in *Ziegler* [*Co. v. Rexnord,* 139 Wis.2d 593, 407 N.W.2d 873 (1987) ] can be adapted to this inquiry and is consistent with the legislative intent to protect investments in dealership relationships when the dealer makes a substantial investment in the Wisconsin market." *Baldewein* at 74, 606 N.W.2d 145. Accordingly, decisions applying the "community of interest" test will be used to guide the Court's analysis.[7]

### First Factor: Percent of total sales in Wisconsin

Baldewein's Wisconsin sales for the first 51 years of the dealership were *de minimis.* While Baldewein's sale of Tri–Clover products in Wisconsin never accounted for more than 7% of its total Tri–Clover sales, its Wisconsin sales were increasing and had reached 7% in the dealership's last two years. Over the last five years of the relationship, Wisconsin sales averaged 4% of Baldewein's Tri–Clover sales for a total of $200,000 in revenue. *Id.* at 78, 606 N.W.2d 145 (C.J. Abrahamson concurring).[8] As previously noted, the Wisconsin Supreme Court recognized that "sales percentages are highly significant.... In many cases, the dealer's level of sales in Wisconsin may be the single most influential factor in determining whether the

**7.** The Court is, of course, mindful that the two tests have "different purposes. The *Baldewein* test is designed to focus the court's inquiry on the nature and extent of the dealership's development of, investment in, and reliance upon the *Wisconsin market.* On the other hand, the [community of interest] test is designed to measure whether the parties have a continuing financial interest in their business relationship, and whether the business relationship is so interdependent that there is a community of interest. Thus, one test focuses on the parties' link *to Wisconsin,* while the other focuses on the parties' link with *each*

*other.*" Eric J. Meier, *When is a Business a "Wisconsin Business"?* Baldewein v. Tri–Clover: *A New Multifactor Approach to the "Situated in This State" Requirement of the Wisconsin Fair Dealership Law,* 2001 Wis. L.Rev. 1403, 1426 n. 151 (emphasis in original) (internal citations omitted).

**8.** According to Tri–Clover's calculations, the average is less than 3% from 1992 through 1995, DR ¶ 19, but the difference is not important for the Court's decision today.

dealership is situated here." *Id.* at 74, 606 N.W.2d 145. Indeed, the Court went on to note that "the higher the percentage of Wisconsin sales or revenues generated from the grantor's products, the less important the other indicators of 'investment' become, because a substantial level of sales activity in this state is more easily seen as indicative of a substantial investment in and reliance upon the Wisconsin market." *Id.* at fn. 9, 606 N.W.2d 145. The numbers do indicate that Baldewein's "development of, investment in and reliance upon the Wisconsin market" over the years with regard to its contract with Tri–Clover was increasing. Clearly, however, the percentage of Wisconsin sales, even at its recent peak of 7%, is not high enough to render the remaining factors "less important." Ultimately, the Court cannot conclude that a *de minimis* level of sales in Wisconsin for the first 51 years of the relationship, 7% sales over the last two years and an average of 4% over the last five years is evidence that Baldewein's "development of, investment in and reliance upon the Wisconsin market" was anything but minimal. Application of the "percentage of sales" factor indicates that the dealership was *not* situated in Wisconsin.

## Second Factor: How long Baldewein and Tri–Clover have dealt with each other in Wisconsin

The parties do not dispute that there have always been some sales of Tri–Clover products in Wisconsin for the entire 56 years of the dealership agreement, although as noted above, for the first 51 years, the level of sales was *de minimis*. Nonetheless, on some level, Baldewein and Tri–Clover have always "dealt with each other" in Wisconsin. Accordingly, this factor favors a finding that the dealership was "situated in" Wisconsin.

## Third Factor: Extent and nature of the obligations imposed on Baldewein regarding operations in Wisconsin

Courts analyzing this factor under the "community of interest" test examine the contractual obligations as well as the extent of the burden such obligations impose on the dealer. *Beloit Beverage Co. v. Winterbrook Corp.*, 900 F.Supp. 1097, 1108–09 (E.D.Wis.1995). In this respect, Baldewein outlines numerous obligations imposed by Tri–Clover, including maintenance of an $80,000.00 inventory of Tri–Clover products, minimum purchases each year, hiring personnel with specific degrees, submission of sales forecasts, and "a myriad of other requirements." Brief in Support, p. 23. Baldewein seems to imply that because it met these requirements in the course of dealing with its Wisconsin customers, they should be considered "obligations imposed regarding operations in Wisconsin." For instance, Tri–Clover provided Baldewein with advertising material to send to its customers. However, simply because some of these customers happened to be from Wisconsin, it cannot be said that Tri–Clover was imposing a "Wisconsin-specific" requirement. Indeed, as will be discussed below, Baldewein's dealership extended to every state in the Union. None of these requirements were specific to *any* state, including Wisconsin. Accordingly, application of this factor merits a finding that Baldewein's dealership was not situated in Wisconsin.

## Fourth Factor: Extent and nature of the grant of territory in Wisconsin

When analyzing the corresponding factor under the "community of interest" test, courts focus on two elements: extensiveness and exclusivity. "An extensive and exclusive territory certainly weighs in favor of a dealership [for purposes of 'community of interest' analysis]." See *Beloit*

*Beverage* at 1108–09; See also *Guderjohn v. Loewen–America, Inc.*, 179 Wis.2d 201, 213, 507 N.W.2d 115, 120 (Ct.App.1993) (lack of exclusive distributorship favored finding that there was no "community of interest") and *C.L. Thompson Co. v. Festo Corp.*, 708 F.Supp. 221, 226 (E.D.Wis.1989) (no dealership when, among other things, grant of territory was not exclusive). Baldewein was given permission to sell Tri–Clover products throughout every state in the Union, including Wisconsin. While the grant of territory was great, as it encompassed the entire state, the nature of the grant was non-exclusive. Accordingly, this factor is neutral and is not helpful to the analysis.

### Fifth Factor: Extent and nature of the use of Tri–Clover's proprietary marks in Wisconsin

Baldewein used Tri–Clover's proprietary marks in all of its advertising and promotional materials.[9] The proprietary marks were then distributed to Wisconsin customers and potential customers via advertisements in the Chicago Yellow Pages. The proprietary marks were also used in the Thomas Register, a national industrial register. Both of these publications were distributed in Wisconsin, but the extent and duration of these distributions are unknown. Furthermore, all of Baldewein's advertising materials, including letters, brochures, line cards, catalogs and calendars used Tri–Clover's proprietary marks. These promotional materials were sent to 111 Wisconsin customers and potential customers. PFOF, ¶ 19.

Under a "community of interest" analysis, courts examine whether the use of proprietary marks is more than *de minimis*. See *Kornacki v. Norton Performance Plastics*, 956 F.2d 129, 134 (7th Cir.1992); see also *Beloit Beverage* at 1109. The Wisconsin Supreme Court has held that "it is eminently clear that there must be more than the mere use of a calling card identifying a manufacturer's representative as an agent for a company before such representatives are 'dealerships.' " *Foerster v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 20, 313 N.W.2d 60, 61 (1981). It is, at a minimum, undisputed that Baldewein used Tri–Clover's proprietary marks in Wisconsin. However, Baldewein has not established that it used Tri–Clover's proprietary marks extensively in Wisconsin. For instance, the Court has no statistics regarding the circulation of the Chicago Yellow Pages in Wisconsin or the Thomas Register in Wisconsin. In any event, simply because these publications happened to be distributed and circulated in Wisconsin does not reflect an effort targeted at the Wisconsin market. Baldewein most likely advertised in the Chicago Yellow Pages because it conducted most of its business there. Similarly, Baldewein has failed to establish whether 111 promotional mailings is significant with respect to its overall operation. Accordingly, the Court cannot conclude that the use of Tri–Clover's proprietary marks in Wisconsin was more than *de minimis*, and therefore, this factor merits a finding that the dealership was not situated in Wisconsin.[10]

### Sixth Factor: Extent and nature of Baldewein's financial investment in inventory, facilities, and good will of the dealership in Wisconsin

Baldewein had no facilities in Wisconsin. Baldewein argues that it had a finan-

---

**9.** The term "proprietary mark" refers to a company logo.

**10.** Indeed, in the absence of more specific evidence, one is left to assume that the extent and nature of Baldewein's use of Tri–Clover's proprietary marks in Wisconsin would be roughly proportional to the percentage of sales to Wisconsin customers, and as the Court concluded above, the percentage of sales in Wisconsin was not significant.

cial investment in inventory in Wisconsin because its two successive "Wisconsin employees," Stevens and Spore, kept inventory at their Wisconsin homes, and Val Baldewein kept inventory at his Powers Lake, Wisconsin cottage during the 1980's. Tri–Clover concedes that Stevens kept inventory in the form of standard fittings and an occasional pump at his Wisconsin home, valued between $500 and $1,000, DFOF, ¶ 21, while Baldewein claims that Stevens and Spore kept pumps in inventory valued between $3,000 and $10,000. PFOF, ¶ 36A; DR, ¶ 36. Tri–Clover also concedes that Val Baldewein kept inventory at his summer home, but its precise value is unclear.[11] PFOF, ¶ 36A. Using the most generous assessment of these facts for Baldewein's purposes, the most that can be established is that for the first 51 years of the relationship, there may have been at any given time as much as $2,000 in Tri–Clover inventory in Val Baldewein's summer home, and for the next 5 years (1991 to 1996) there may have been at any given time as much as $10,000 in inventory at an employee's Wisconsin home. Accordingly, the value of the inventory kept in Wisconsin at any given time was never very significant.

Furthermore, when analyzing this factor under the "community of interest" test, courts look not only to the size of the

investment but to its recoverability. See *Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir.1989). "[W]hen a sizable investment is not fully recoverable, the WFDL is intended to remedy any subsequent inequalities in bargaining position by removing the grantor's threat of arbitrary termination." Meier, *WFDL: "Situated in this State" Requirement* at 1434. Aside from being insignificant, there is nothing in the record to suggest that the inventory kept in Wisconsin was "Wisconsin specific," *i.e.*, that it could not be sold to customers outside of Wisconsin. Even if one assumes that the amount of inventory kept in Wisconsin was significant, the investment in inventory was recoverable. Thus application of this factor favors a finding that the dealership was not situated in Wisconsin.[12]

### Seventh Factor: The personnel devoted to the Wisconsin market

Baldewein maintains that the two "Wisconsin Employees," Stevens and Spore, were hired exclusively for the purpose of increasing sales in Wisconsin.[13] PFOF, ¶ 38. Tri–Clover disputes this assessment, pointing out that Stevens never had Wisconsin sales quotas. DFOF, ¶ 28. Tri–Clover further argues that Stevens spent less than 50% of his time on Wisconsin sales prior to 1994 and possibly more than 50% of his time on Wisconsin sales after 1994. DFOF, ¶ 29.

---

**11.** In Baldewein's brief, they argue that the value of this inventory ranged from $500 to $2,000, but a dollar amount is not specified in their findings of fact.

**12.** Baldewein also argues that it invested in good will when its employees visited the Tri–Clover offices in Kenosha from time-to-time for training seminars, to pick-up orders for delivery to a customer, and to attend award banquets. Brief in Opposition, p, 18; PFOF, ¶ 39. This "financial investment" in good will cannot be considered anything but *de minimis*. A few visits to Tri–Clover's offices

in Kenosha would seem to be par for the course.

**13.** Baldewein also claims that *all* of its employees were devoted to sales in Wisconsin, as well as other customers. PFOF, ¶ 38. This may be true in an abstract sense, but the Court believes that the Wisconsin Supreme Court meant "devoted to" in the sense that a particular employee's responsibilities were only to promote sales in Wisconsin. Absent that, Baldewein has offered no evidence regarding all of its other employees' "efforts" regarding sales in Wisconsin.

It is undisputed that Spore replaced Stevens. Accordingly, only one of the two "Wisconsin employees" worked for Baldewein at any given time. Even assuming that these employees were exclusively devoted to sales in Wisconsin, one employee is not significant for a company that had total annual sales figures that fluctuated between two and three million dollars from 1993 through 1997.[14] PFOF, ¶ 15. Furthermore, Val Baldewein's solicitation of customers in Wisconsin from 1959 through approximately 1990 is not enough to swing this factor in Baldewein's favor. Baldewein does not establish that Val Baldewein was exclusively devoted to Wisconsin sales. The most that is established is that from 1959 through 1990, Baldewein had one employee who attempted to solicit Wisconsin sales, and from 1991 through 1996, Baldewein had, at any given time, one employee who may or may not have been exclusively devoted to Wisconsin sales.[15] Therefore, application of this factor favors a finding that the dealership was not situated in Wisconsin.

### Eighth Factor: Level of advertising and/or promotional expenditures in Wisconsin

During the fiscal years of 1993, 1994, and 1995, Baldewein spent approximately $40,000 a year on advertising.[16] Baldewein advertised as a Tri–Clover dealer in the Chicago Yellow Pages, which cost approximately $2,000 per month ($24,000 per year), and in the Thomas Register, which cost approximately $4,500 per year. PFOF, ¶ 19. Therefore, Baldewein implies that, during this time-span, it spent $28,500 of its $40,000 advertising budget on advertising in Wisconsin. Not so. The Chicago Yellow Pages presumably have a much greater circulation in Chicago and Illinois in general than it does in Wisconsin and other surrounding states. Similarly, the Thomas Register is a national register, so the $4,500 per year must be spread out over all fifty states (approximately $90 per state). In any event, the Court cannot determine the amount of money spent on advertising in Wisconsin as compared to other states.

However, analysis of this factor under the "community of interest" test also looks to whether the investment in advertising is recoverable, *i.e.*, whether the advertising would be worthless if the dealership was terminated. See *Moore v. Tandy Corp.*, 819 F.2d 820, 823 (7th Cir.1987). Most or all of these advertising expenditures are recoverable. The Chicago Yellow Pages advertisements are, of course, viable in Chicago, and the Thomas Register is viable on a national level. Conversely, there is *no* evidence that Baldewein spent money on advertising that is useful *only in Wisconsin*.[17] Furthermore, courts also examine whether the advertising expenses were discretionary.[18] See *Cabinetree of Wis.*

---

14. These employees were paid about $50,000 each per year plus bonus. PFOF, ¶ 17.

15. It would be useful to compare the number of employees devoted to other markets with the number devoted to Wisconsin. However, there are no facts before the Court which would facilitate such an analysis. In the absence of such statistics, the Court can only conclude that Baldewein's distribution of sales associates from state to state is commensurate with the volume of sales in those states.

16. There are no statistics regarding Baldewein's advertising expenditures before 1993.

17. Baldewein did send 111 mailings to prospective and current Wisconsin customers. However, these were provided by Tri–Clover, so the monetary investment apparently was limited to labor and postage. This amount is not significant compared to a $40,000 advertising budget.

18. Non-discretionary expenses "provide the type of opportunity for exploitation contemplated under the WFDL." *Cabinetree* at 301.

*Inc. v. Kraftmaid Cabinetry, Inc.*, 914 F.Supp. 296, 301 (E.D.Wis.1996). There is no evidence that Baldewein was required to advertise in Wisconsin to maintain its dealership. Given the inconclusive amount spent on advertising, the fact that the amounts were recoverable and finally that these expenditures were discretionary, application of this factor also shows that Baldewein's dealership was not situated in this state.

### Ninth Factor: Extent and nature of supplemental services provided in Wisconsin

With regard to supplemental services, Baldewein performed consulting, design, and installation services for its Wisconsin customers and potential customers. PFOF, ¶ 37. The consulting services included: "a) how a Tri–Clover part works and how to improve performance of that part; b) how to design a system to make their operation perform better; and c) Baldewein's design of a system for a new product line or to improve an existing product line." *Id.* Baldewein did not charge for these services. *Id.* The extent of these services is not known, so the Court is left to assume that it was roughly proportional to the percentage of sales to Wisconsin customers, which, as the Court concluded above, was not significant.[19] Accordingly, this factor favors a finding that Baldewein's dealership was not situated in Wisconsin.

### SUMMARY: Baldewein's dealership was not "situated in" Wisconsin

Application of seven of the factors outlined by the Wisconsin Supreme Court (including percentage of sales) support the conclusion that the Baldewein dealership was not situated in Wisconsin. The application of the "grant of territory" factor is neutral while the "length of relationship" factor favors a finding that the dealership was situated in Wisconsin. The overwhelming amount of factors supporting the conclusion that Baldewein was not a dealership "situated in this state" dictate the end result. Considering Baldewein's "total involvement and investment in promoting and selling [Tri–Clover's] products ... *in the State of Wisconsin*," it cannot be considered the grantee of a dealership "situated in" Wisconsin, and Tri–Clover cannot be held liable under the WFDL. *Baldewein* at 62, 606 N.W.2d 145 (emphasis added).

### TRI–CLOVER'S COUNTERCLAIM

Tri–Clover has counterclaimed for the amount of unpaid-for shipments. Baldewein's only defense is that Tri–Clover was required to accept the return of inventory under the WFDL, but this defense must fail because, as the Court has concluded, the WFDL is inapplicable to the case at bar. Accordingly, Tri–Clover is entitled to summary judgment on its counterclaim.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Baldewein's motion for summary judgment is DENIED; and

2. Tri–Clover's motion for summary judgment is GRANTED, such that Baldewein's claims are DISMISSED, and judgment shall be entered against Baldewein, in Tri–Clover's favor, in the amount of $19,045.55.

**SO ORDERED.**

---

**19.** It is impossible to ascertain how many "potential Wisconsin customers" Baldewein had, much less how many of them it performed supplemental services for.